## UNITED STATES DISTRICT COURT
## DISTRICT OF MAINE

| | | |
|---|---|---|
| BRANDON M. GROSS, | ) | |
| | ) | |
| Plaintiff | ) | |
| | ) | |
| v. | ) | 2:17-cv-00297-LEW |
| | ) | |
| SCOTT R. LANDRY, et al., | ) | |
| | ) | |
| Defendants | ) | |

## RECOMMENDED DECISION ON DEFENDANTS'
## MOTION FOR SUMMARY JUDGMENT

In this action, Plaintiff alleges that while he was in the custody of the Maine Department of Corrections, Defendants Correct Care Solutions, LLC, Robert Clinton, M.D., Hope Freeman, N.P., Cindy McDonough, N.P., and Wendy Riebe acted with deliberate indifference toward his serious medical needs and discriminated against him based on a hearing deficit. (Complaint ¶ 1, ECF No. 1.)

The matter is before the Court on Defendants' Motion for Summary Judgment. (ECF No. 70.) Following a review of the summary judgment record and after consideration of Defendants' arguments,[1] I recommend the Court grant Defendants' motion for summary judgment.

## PROCEDURAL BACKGROUND

Plaintiff filed his complaint on August 8, 2017, asserting claims against 15 defendants related to a hearing deficit and disciplinary action taken against him while he

---

[1] Plaintiff did not file an opposition to the motion.

was incarcerated. (ECF No. 1.) After dismissal or summary judgment was entered in favor of the State defendants,[2] Defendants Correct Care Solutions, LLC, Robert Clinton, M.D., Hope Freeman, N.P., Cindy McDonough, N.P., and Wendy Riebe (Defendants) filed a motion summary judgment (Motion, ECF No. 70) together with a statement of material facts in support of the motion. (ECF No. 71, hereinafter DSMF.) Plaintiff did not file a response to the motion.

## SUMMARY JUDGMENT STANDARD

"The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). "After the moving party has presented evidence in support of its motion for summary judgment, 'the burden shifts to the nonmoving party, with respect to each issue on which he has the burden of proof, to demonstrate that a trier of fact reasonably could find in his favor.'" *Woodward v. Emulex Corp.*, 714 F.3d 632, 637 (1st Cir. 2013) (quoting *Hodgens v. Gen. Dynamics Corp.*, 144 F.3d 151, 158 (1st Cir. 1998)).

---

[2] Plaintiff also filed an application to proceed in forma pauperis (ECF No. 4,) which application the Court granted on August 15, 2017. (ECF No. 6.) Because Plaintiff was "a prisoner seek[ing] redress from a governmental entity or officer or employee of a governmental entity," 28 U.S.C. § 1915A(a), and in accordance with the in forma pauperis statute, 28 U.S.C. § 1915(e)(2), I conducted a preliminary review of Plaintiff's complaint. On November 17, 2017, I recommended the Court dismiss claims against Department of Corrections personnel, but order service on the medical personnel and the Warden of the Maine Correctional Center. (Recommended Decision after Screening Complaint, ECF No. 19.) The Court adopted the recommendation on December 18, 2017. (Order Affirming Recommended Decision, ECF No. 20.) On February 16, 2018, the Warden filed a motion for summary judgment, in which he argued that the only claim against him was for prospective relief and that the claim was moot because Plaintiff had been transferred to another facility. (ECF No. 30.) On September 19, 2017, I recommended that the Court grant the Warden's motion. (Recommended Decision on Defendant Landry's Motion for Summary Judgment, ECF No. 54.) The Court adopted the recommended decision on June 25, 2018. (ECF No. 55.)

A court reviews the factual record in the light most favorable to the non-moving party, resolving evidentiary conflicts and drawing reasonable inferences in the non-movant's favor. *Perry v. Roy*, 782 F.3d 73, 77 (1st Cir. 2015). If a court's review of the record reveals evidence sufficient to support findings in favor of the non-moving party on one or more of his claims, a trial-worthy controversy exists and summary judgment must be denied as to any supported claim. *Id.* ("The district court's role is limited to assessing whether there exists evidence such that a reasonable jury could return a verdict for the nonmoving party." (internal quotation marks omitted)). Unsupported claims are properly dismissed. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323-24 (1986).

### SUMMARY JUDGMENT RECORD

When presented with a summary judgment motion, a court ordinarily considers only the facts included in the parties' statements of material facts, which statements must be supported by citations to evidence of record. Federal Rule of Civil Procedure 56(c) and District of Maine Local Rule 56(b) – (d) require the specific citation to record evidence. In addition, Local Rule 56 establishes the manner by which parties must present their factual statements and the evidence on which the statements depend. A party's pro se status does not relieve the party of the obligation to comply with the court's procedural rules.[3]

---

[3] "[T]he Court is required to maintain a strict neutrality between opposing parties and even though a more forgiving reading may be appropriate for a pro se party in the summary judgment context, it is also true that '[j]udges and magistrate judges who review these filings must be able to rely on procedural rules so as to avoid becoming the lawyer for the unrepresented [party] or devoting an excessive portion of their time to such cases.'" *United States v. Baxter*, 841 F. Supp. 2d 378, 383 (D. Me. 2012) (quoting *Clarke v. Blais*, 473 F. Supp. 2d 124, 129 (D. Me. 2007)).

*Ruiz Rivera v. Riley*, 209 F.3d 24, 27 – 28 & n. 2 (1st Cir. 2000); *Marcello v. Maine*, 489 F. Supp. 2d 70, 77 (D. Me. 2007).

By rule, a party seeking summary judgment must file, in addition to its summary judgment motion, a supporting statement of material facts setting forth each fact in a separately numbered paragraph, with each factual statement followed by a citation to evidence of record that supports the factual statement. D. Me. Loc. R. 56(b). A party opposing a motion for summary judgment must file an opposing statement in which it admits, denies, or qualifies the moving party's statements by reference to each numbered paragraph, with citations to supporting evidence, and in which it may set forth additional facts, in separately numbered paragraphs, with citation to supporting evidence. D. Me. Loc. R. 56(c). If an additional statement is introduced by the non-moving party, the moving party must file a reply statement in which it admits, denies, or qualifies the non-moving party's additional statements by reference to each numbered paragraph, with citations to supporting evidence. D. Me. Loc. R. 56(d).

"Facts contained in a supporting or opposing statement of material facts, if supported by record citations as required by this rule, shall be deemed admitted unless properly controverted." D. Me. Loc. R. 56(f). Additionally, "[t]he court may disregard any statement of fact not supported by a specific citation to record material properly considered on summary judgment." *Id.* Finally, "[t]he court shall have no independent duty to search or consider any part of the record not specifically referenced in the parties' separate statement of facts." *Id.*

Nevertheless, the factual assertions contained in the verified pleadings and affidavits filed by a pro se litigant generally will be considered in the review of a summary judgment motion. That is, where a pro se litigant has failed to comply strictly with the summary judgment rules, this Court has considered the sworn assertions of record. *See Clarke v. Blais*, 473 F. Supp. 2d 124, 128 – 30 (D. Me. 2007) ("The First Circuit has not addressed this notice debate directly, but has said, in the summary judgment context, that unrepresented plaintiffs' opposing affidavits and opposition papers are to be read 'liberally.'" (citing *Posadas de Puerto Rico*, *Inc. v. Radin*, 856 F.2d 399, 401 (1st Cir. 1988), and *Mas Marques v. Digital Equip. Corp.*, 637 F.2d 24, 27 (1st Cir. 1980)); *Demmons v. Tritch*, 484 F. Supp. 2d 177, 182 – 83 (D. Me. 2007).

## FACTUAL BACKGROUND[4]

### A.    Initial Health Assessments

On November 24, 2015, upon Plaintiff's admission to the Maine Correction Center (MCC), Stephen Dorsey, a nurse, conducted an initial health screening of Plaintiff. (DSMF ¶ 2.)  Nursing staff screen all inmates/patients upon admission to obtain background information regarding a person's health history, identify immediate health concerns for patients, and identify a person's current medications. (*Id.* ¶ 1.)  At that initial health screening, Plaintiff did not report any problems with his hearing. (*Id.* ¶ 3.)

---

[4] The following facts are derived primarily from Defendants' statements of material facts. Plaintiff did not file a response to the factual assertions contained in Defendants' statement. Accordingly, given the failure to respond, Plaintiff's ability to contest any of Defendants' factual assertions is limited to statements contained in his complaint, which Plaintiff signed under penalty of perjury.

Within approximately 14 days of an individual's admission to MCC, a health care provider performs an Admission Health Assessment of the individual. (*Id.* ¶ 4.) Defendant Freeman performed an assessment of Plaintiff on December 7, 2015. (*Id.* ¶ 5.) During the assessment, Plaintiff reported that he had previously sustained a head injury that made him a little "slower" and had negatively impacted his memory. (*Id.* ¶ 8.) Plaintiff also reported that he had hearing issues since childhood, which included a procedure to place tubes in both ears. (Complaint ¶ 23.)[5] Defendant Freeman examined Plaintiff's ears, which were normal, as was his hearing. (DSMF ¶ 9.) Following the assessment, Defendant Freeman completed a Physical Activity Limitation form, which details any limitations for the person assessed. (*Id.* ¶¶ 10 – 11.) Defendant Freeman did not identify any physical disability for Plaintiff, and she did not impose any restrictions based on his medical condition. (*Id.* ¶ 12.)

On April 30, 2016, another registered nurse, RN Smith, saw Plaintiff for a number of issues reported by him through a Sick Call slip, including a complaint that his "left ear can't really hear." (*Id.* ¶ 13.) In the progress note for that date, RN Smith recorded that Plaintiff declined to let her look at his ear. (*Id.* ¶ 14.) On June 4, 2016, Nurse Rosten examined Plaintiff for complaints regarding his hearing and did not note any abnormalities other than possible fluid behind the eardrum. (*Id.* ¶ 15.) RN Rosten noted that Plaintiff did not have a documented hearing impairment and Plaintiff advised that he had never been

---

[5] Defendant Freeman claims that Plaintiff never mentioned a hearing impairment, DSMF ¶¶ 6, 8, but the Court adopts Plaintiff's version of disputed facts at the summary judgment stage.

diagnosed with a hearing impairment. (*Id.* ¶ 16.) RN Rosten referred Plaintiff to a provider. (*Id.*

**B.     Efforts to Accommodate a Hearing Deficit**

On June 14, 2016, Plaintiff requested a "hard of hearing" sign for his door and reported that his alarm clock had recently broken. (*Id.* ¶ 17.) At MCC, twice daily, at 6:00 a.m. and 6:00 p.m., a corrections officer yells "Count," and all prisoners are expected to be awake and sitting or standing up in their assigned cells. (Complaint ¶ 35.) A deviation from this formal routine results in a disciplinary infraction. (*Id.*)

On June 29, 2016, Plaintiff saw Defendant McDonough for complaints about write-ups he had received for missing count and failing to follow security instructions. (DSMF ¶ 18.) Plaintiff reported to Defendant McDonough that his hearing in his left ear was diminished. (*Id.* ¶ 19.) Defendant McDonough examined Plaintiff's ear and noted scarring of the left tympanic membrane. (*Id.* ¶ 20.) In her assessment, Defendant McDonough noted that Plaintiff had a hearing deficit in his left ear. (*Id.* ¶ 21.) Following this visit, Defendant McDonough entered an order to "[p]lease give Mr. Gross instructions directly. Hearing deficit left ear." (*Id.* ¶ 22.) Plaintiff was provided with this information through a Patient Communication Form on July 3, 2016. (*Id.* ¶ 23.) Plaintiff's Physical Activity Limitation form was revised to include: "Patient has a hearing deficiency in LEFT ear only. Please speak DIRECTLY to patient." (*Id.* ¶ 24.) Plaintiff was provided with a placard for his door informing corrections officers that he had difficulty hearing and instructing them to wake Plaintiff at the 6:00 a.m. count. (*Id.* ¶ 24; ECF No. 2-34.)

On August 29, 2016, Defendant Riebe met with the unit sergeant for Plaintiff's dorm at MCC (Sgt. Landry) regarding Plaintiff's concerns that he had received a write-up and a Class A formal violation for sleeping through count.  (*Id.* ¶ 25.)  Plaintiff previously told Defendant Riebe that he received the write-up because of the hearing loss in his left ear; Sgt. Landry advised Defendant Riebe that Plaintiff received the informal write-up in May because Plaintiff and his roommate slept in on more than one occasion, and that Plaintiff had signed and accepted the two-day room restriction imposed as a result.  (*Id.* ¶¶ 26 – 27.)  Sgt. Landry also told Defendant Riebe that Plaintiff received the Class A violation for leaving his room during the cell restriction.  (*Id.* ¶ 28.)  Sgt. Landry stated this was the only time that Plaintiff had received a write-up for sleeping-in during count.  (*Id.*)

## C.  Revision of the Hearing Deficit Assessment

On August 29, 2016, Defendant Freeman saw Plaintiff on referral from nursing for a number of complaints, including complaints regarding his ears.  (*Id.* ¶ 29.)  Plaintiff told Defendant Freeman that he had lifelong ear symptoms that had required tubes as a child. (*Id.* ¶ 30.)  He also told her that he had diminished hearing in his left ear and mentioned the write-ups he had received for sleeping through count.  (*Id.*)  Plaintiff expressed hope that Defendant Freeman could do something to resolve the write-ups.  (*Id.* ¶ 32.)  She explained to Plaintiff the medical department's role in such situations, and she informed him that it generally was not useful to use a medical defense if the medical problem was not noted prior to the write-up.  (*Id.*)

During the course of the August 29, 2016 visit, Defendant Freeman repeatedly tested Plaintiff's hearing by using a soft voice with her face turned away or obscured by

her computer screen. (*Id.* ¶ 33.) Plaintiff responded appropriately to her questions, which suggested that he was able to hear her. (*Id.*) Defendant Freeman examined Plaintiff's ears, which were normal except for some scars from tympanostomy tubes. (*Id.* ¶ 34.) She did not observe any perforation, redness, canal wax or inflammation. (*Id.*)

On September 7, 2016, Defendant Riebe met with Plaintiff to discuss two recent letters he had written to her regarding his write-ups and the Class A formal violation. (*Id.* ¶ 35.) Plaintiff attributed his write-ups to the hearing issue in his left ear. (*Id.*) Plaintiff wanted Defendant Correct Care Solutions (CCS) to take some action to remove the write-ups from his record. (*Id.* ¶ 36.) Plaintiff was concerned that he would not be able to go to a minimum-security facility with the write-ups on his record. (*Id.*)

Given Plaintiff's concerns, Defendant Riebe called Unit Manager Luke Monahan to get more information regarding the write-ups. (*Id.* ¶ 38.) Mr. Monahan stated that Plaintiff had received the informal write-ups and had admitted responsibility and signed the informal write-ups when Plaintiff was not required to do so. (*Id.*) Defendant Riebe subsequently advised Plaintiff that there was nothing Defendant CCS could do with respect to the write-ups. (*Id.* ¶ 39.)

Defendant McDonough saw Plaintiff on November 30, 2016 for his annual assessment. (*Id.* ¶ 40.) She did not identify any concerns with respect to Plaintiff's hearing. (*Id.*) Defendant McDonough updated Plaintiff's Physical Activity Limitation form on December 3, 2016. (*Id.* ¶ 41.) The form no longer contained a limitation/restriction with respect to Plaintiff's hearing. (*Id.*)

On January 8, 2017, Plaintiff was seen by nursing for ongoing non-specific pain issues. (*Id.* ¶ 42.) Plaintiff reported that he was not sleeping, was always tired, and was missing medications and gym workouts. (*Id.*) When Defendant McDonough met with Plaintiff on January 14, 2017, Plaintiff complained that he was tired and felt restless in the morning so that he could not get out of bed. (*Id.* ¶ 43.) Defendant McDonough examined him and recommended that he go to bed earlier, try to be responsible for getting up in time for activities, and purchase an alarm clock from the commissary. (*Id.* ¶ 44.)

**D.     Plaintiff's Efforts to Obtain Renewed Accommodations**

In April 2017, Plaintiff filed sick call slips and requests to be referred to an outside provider for a hearing test and to have his Physical Activity Limitation form restored. (*Id.* ¶ 45.) Because of Plaintiff's requests, and because of the change in his Physical Activity Limitation form, Defendant Riebe referred Plaintiff to Defendant Freeman for a hearing assessment. (*Id.* ¶ 46.)

On May 17, 2017, Defendant Freeman conducted a hearing assessment of Plaintiff. (*Id.* ¶ 47.) At this assessment, Plaintiff told Defendant Freeman that he had received a few write-ups for not getting up for count, which he attributed to his hearing difficulties. (*Id.* ¶ 48.) Plaintiff explained that other factors, including restlessness in his legs, poor sleep, and roommate issues, also contributed to his waking difficulties. (*Id.*)

Defendant Freeman performed an examination and observed moderate wax in Plaintiff's left ear canal. (*Id.* ¶ 49.) Plaintiff's right ear was normal. (*Id.*) Plaintiff's hearing was intact with finger rub and light snap bilaterally. (*Id.* ¶ 50.) Plaintiff reported that his left ear sounded "different," but that he could hear with that ear. (*Id.*) Plaintiff

could also hear Defendant Freeman's whispers from behind Defendant Freeman's computer screen with her mouth obscured from Plaintiff's view. (*Id.*) Based on her evaluation, Defendant Freeman concluded that Plaintiff had no hearing impairment in the office environment. (*Id.* ¶ 51.) She did not believe that the mild wax in his left canal significantly affected his function. (*Id.*) Although Plaintiff reported difficulty waking for count, based on her examination, Defendant Freeman did not attribute the difficulty to a medical condition. (*Id.* ¶ 52.)

Defendant Freeman informed Plaintiff that she could not retroactively alter his write-ups. (*Id.* ¶ 53.) Defendant Freeman also had a long discussion with Plaintiff about how to address the sleeping-in issue. (*Id.* ¶ 55.) Plaintiff told her that he had purchased an alarm clock, but it was removed by security because Plaintiff had altered the radio. (*Id.*) Defendant Freeman and Plaintiff discussed personal responsibility and self-care. (*Id.*)

On May 31, 2017, Defendant Freeman saw Plaintiff for other complaints, but at the end of the visit he returned to the topic of his inability to get up for count. (*Id.* ¶ 56.) Plaintiff told Defendant Freeman that Plaintiff had an alarm clock and still could not get up for count. (*Id.*) Defendant Freeman told Plaintiff that getting up on time and using an alarm were learned skills and important for success in future jobs. (*Id.* ¶ 57.) Plaintiff raised some ideas for how he could help himself, although he continued to seek a medical solution for his disciplinary issues. (*Id.*) Plaintiff continued to hear well during the course of this May 31, 2017 visit, even when Defendant Freeman used a low voice. (*Id.* ¶ 58.)

On November 14, 2017, Defendant Freeman performed Plaintiff's periodic health assessment. (*Id.* ¶ 59.) As part of the exam, Defendant Freeman noted again the stable

scarring of Plaintiff's left tympanic membrane. (*Id.* ¶ 60.) Plaintiff's could hear a soft voice in an office setting, even with Defendant Freeman's mouth obscured. (*Id.* ¶ 61.) Defendant Freeman noted that Plaintiff had been waking up for count without write-ups for the last 7 months. (*Id.* ¶ 63.)

**E.      Plaintiff's Transfer, Other Medical Treatment, and Release**

On January 19, 2018, Plaintiff was transferred from MCC to Bolduc Correctional Facility. (*Id.* ¶ 64.) Two days later, Plaintiff submitted a sick call slip asking to be seen for ringing in his ears, headaches, diminished hearing, and problems with balance. (*Id.* ¶ 65.) Plaintiff also expressed concern about not hearing staff for counts. (*Id.*) On January 22, 2018, a nurse (RN Rose) met with Plaintiff regarding his complaints of pain, muffled hearing in his left ear, and vertigo. (*Id.* ¶ 66.) RN Rose performed an external and internal ear examination, which she reported as normal. (*Id.* ¶ 67.) She reassured Plaintiff and referred him to a provider. (*Id.*)

On January 25, 2018, Defendant Clinton saw Plaintiff. (*Id.* ¶ 68.) At this visit, Plaintiff described an altercation that had occurred in 2009 between Plaintiff and three other males in which Plaintiff sustained an injury to the left side of his head. (*Id.*) Plaintiff reported that as the result of the altercation, he had little hearing in his left ear, which he described as muffled sounds. (*Id.* ¶ 69.) Plaintiff told Defendant Clinton that his right ear speech discrimination and hearing were normal. (*Id.* ¶ 70.)

Plaintiff told Defendant Clinton that he had a problem getting up for count. (*Id.* ¶ 71.) Plaintiff explained that he had no problem hearing in the community, but he noticed difficulty when he needed to wake up for count. (*Id.* ¶ 73.) Defendant Clinton and Plaintiff

discussed that because Plaintiff had normal hearing in his right ear, responding to count was expected, to which Plaintiff agreed. (*Id.* ¶ 72.) Defendant Clinton advised Plaintiff to alert his correctional officers/administrators about his difficulty getting up for count so that he could develop a strategy for success. (*Id.* ¶ 74.) During the course of the examination, Plaintiff demonstrated no difficulty hearing the conversation and was able to discriminate speech. (*Id.* ¶ 75.) Based on his examination of Plaintiff, Defendant Clinton concluded that Plaintiff did not have a significant hearing loss (one that would impair his ability to function in the correctional environment.) (*Id.* ¶ 76.)

Following the January 25, 2018 office visit, Defendant Clinton introduced Plaintiff to Ben Beal, the Director of the Bolduc Correctional Facility, to alert Mr. Beal to Plaintiff's difficulty waking for count. (*Id.* ¶ 77.) Plaintiff told Mr. Beal that he had difficulty if his right ear was on the pillow when count was called and that he appreciated the opportunity to develop a plan with security for morning count. (*Id.* ¶ 78.)

On February 15, 2018, Defendant Clinton saw Plaintiff for reports of a spinning sensation at night and tinnitus (ringing) in his left ear. (*Id.* ¶ 79.) Defendant Clinton told Plaintiff that his symptoms were consistent with Meniere's disease and they agreed to a trial of Trileptal, a drug used to treat vertigo. (*Id.* ¶ 80.)

Defendant CCS frequently refers patients to outside specialists, including audiologists and ENT specialists, when a patient's medical condition necessitates such a referral. (*Id.* ¶ 82.) Because Plaintiff could hear normally out of his right ear, and by his own admission did not have difficulty hearing in the community, Defendant Clinton

determined that it was not medically necessary to refer him to an outside specialist.[6]  (*Id.* ¶ 86; Complaint ¶ 30.)

On July 5, 2018, Plaintiff was released from the Bolduc Correctional Facility. (DSMF ¶ 81.)

DISCUSSION

## A.    Deliberate Indifference

The Eighth Amendment, which prohibits cruel and usual punishments, governs prisoners' medical needs after conviction, and the Due Process Clause of the Fourteenth Amendment imposes similar obligations while prisoners are in pre-trial custody.  *See City of Revere v. Massachusetts Gen. Hosp.*, 463 U.S. 239, 243 (1983).  The Constitution imposes on state actors the "substantive obligation" not to treat prisoners in their care in a manner that reflects "deliberate indifference" toward "a substantial risk of serious harm to health," *Coscia v. Town of Pembroke*, 659 F.3d 37, 39 (1st Cir. 2011), or "serious medical needs," *Feeney v. Corr. Med. Servs.*, 464 F.3d 158, 161 (1st Cir. 2006) (quoting *Estelle v. Gamble*, 429 U.S. 97, 105 – 106 (1976)).  To be actionable, a deliberate indifference claim must satisfy both an objective and a subjective standard.  *Leavitt v. Corr. Med. Servs.*, 645 F.3d 484, 497 (1st Cir. 2011).

The objective standard evaluates the seriousness of the risk of harm to one's health. For a medical condition to be objectively "serious," there must be "a sufficiently substantial

---

[6] To the extent that Plaintiff has a hearing deficit in his left ear, it is not the result of a degenerative condition or disease, which means that any deficit would not be expected to progress or deteriorate further because of this condition, and an ENT would not be able to provide any treatment to reverse this condition.  (*Id.* ¶¶ 84 – 85.)

'risk of serious damage to [the inmate's] future health.'" *Farmer v. Brennan*, 511 U.S. 825, 843 (1994) (quoting *Helling v. McKinney*, 509 U.S. 25, 35 (1993)). A medical need is serious if it has been diagnosed by a physician as mandating treatment, or is so obvious that even a lay person would recognize a need for medical intervention. *Leavitt*, 645 F.3d at 497; *Gaudreault v. Mun. of Salem*, 923 F.2d 203, 208 (1st Cir. 1990), *cert. denied*, 500 U.S. 956 (1991).

The subjective standard concerns the culpability of the defendant. There must be evidence that a particular defendant possessed a culpable state of mind amounting to "deliberate indifference to an inmate's health or safety." *Farmer*, 511 U.S. at 834 (internal quotation marks omitted). Deliberate indifference is akin to criminal recklessness, "requiring actual knowledge of impending harm, easily preventable." *Feeney*, 464 F.3d at 162 (quoting *Watson v. Caton*, 984 F.2d 537, 540 (1st Cir. 1993)). The focus of the deliberate indifference analysis "is on what the jailers knew and what they did in response." *Burrell v. Hampshire Cnty.*, 307 F.3d 1, 8 (1st Cir. 2002). In other words, the subjective standard focuses on whether the Defendants had a "purposeful intent" to neglect Plaintiff's serious medical needs. *Perry v. Roy*, 782 F.3d 73, 79 (1st Cir. 2015) (citing *Estelle,* 429 U.S. at 105). A showing of such an intent requires evidence that the alleged absence or inadequacy of treatment was intentional. *Id.* (citing *Estelle*, 429 U.S. at 105 (holding that "an inadvertent failure to provide adequate medical care" is not a constitutional violation), and *Watson,* 984 F.2d at 540 ("The courts have consistently refused ... to conclude that simple medical malpractice rises to the level of cruel and unusual punishment.")). "The typical example of a case of deliberative indifference would be one in which treatment is

denied in order to punish the inmate." *Id.* (internal quotation marks omitted). However, a showing of "wanton disregard" will also raise a genuine issue for trial. *Id.* (quoting *Battista v. Clarke,* 645 F.3d 449, 453 (1st Cir. 2011)). Deliberate indifference thus must be based on much more than ordinary negligence. The First Circuit has explained:

> A finding of deliberate indifference requires more than a showing of negligence. *Estelle v. Gamble*, 429 U.S. 97, 106 (1976) (holding that "[m]edical malpractice does not become a constitutional violation merely because the victim is a prisoner"); *Sires v. Berman*, 834 F.2d 9, 13 (1st Cir. 1987). A plaintiff claiming an eighth amendment violation with respect to an inmate's serious mental health or safety needs must allege "acts or omissions sufficiently harmful to evidence deliberate indifference." *Estelle*, 429 U.S. at 106; *see also Cortes-Quinone v. Jimenez-Nettleship*, 842 F.2d 556, 558 (1st Cir.), *cert. denied*, 488 U.S. 823 (1988). Although this court has hesitated to find deliberate indifference to a serious need "[w]here the dispute concerns not the absence of help, but the choice of a certain course of treatment," *Sires*, 834 F.2d at 13, deliberate indifference may be found where the attention received is "so clearly inadequate as to amount to a refusal to provide essential care."

*Torraco v. Maloney*, 923 F.2d 231, 234 (1st Cir. 1991).

Under the objective prong, even viewing the facts in the light most favorable to Plaintiff, Plaintiff has not demonstrated that he has a condition that presents a substantial risk of serious harm to his health. The unrebutted medical evidence establishes that any hearing deficit Plaintiff might have is not the result of a degenerative condition that could lead to further medical risk. Furthermore, the record reveals that Plaintiff received prompt attention from medical professionals on numerous occasions. Defendants did not disregard Plaintiff's complaints. Plaintiff simply disagreed with the medical professionals' conclusion that his level of hearing deficit in one ear did not necessitate further treatment or the accommodation Plaintiff sought. A disagreement regarding treatment, without more,

cannot sustain a deliberate indifference claim. *Kosilek v. Spencer*, 774 F.3d 63, 82 (1st Cir. 2014) ("This prong does not impose upon prison administrators a duty to provide care that is ideal, or of the prisoner's choosing").

The record also lacks a genuine dispute about the culpability of Defendants under the subjective prong. Defendants repeatedly investigated Plaintiff's concerns about his hearing capability in his left ear, worked to help him develop a strategy to avoid further disciplinary actions, and attempted to coordinate with corrections officials to ensure the success of Plaintiff's efforts. As explained above, the essence of the dispute is focused on Defendants' medical judgment, not on Defendants' failure to commit the appropriate time, care and expertise to Plaintiff's complaints. *See Ferranti v. Moran*, 618 F.2d 888, 891 (1st Cir. 1980) ("[A]llegations simply reflect[ing] a disagreement on the appropriate course of treatment . . . falls short of alleging a constitutional violation").

In sum, on this record, a fact finder could not reasonably conclude that Defendants acted with deliberate indifference to a serious medical need. Defendants, therefore, are entitled to summary judgment on Plaintiff's deliberate indifference claim.

**B.     Disability Discrimination**

"Congress enacted the [Americans with Disabilities Act] 'to provide a clear and comprehensive national mandate for the elimination of discrimination against individuals with disabilities.'" *Parker v. Universidad de Puerto Rico*, 225 F.3d 1, 4 (1st Cir. 2000) (quoting 42 U.S.C. § 12101(b)). "Title I of the ADA prohibits discrimination in employment." *Id.* "Title II . . . prohibits discrimination against persons with disabilities by 'public entities,' and is modeled on § 504 of the Rehabilitation Act, Pub.L. No. 93–112,

87 Stat. 355 (1973) (codified as amended in scattered sections of 29 U.S.C.)." *Id.* "In applying Title II, therefore, [courts] rely interchangeably on decisional law applying § 504." *Id.* "Title III prohibits discrimination in access to public accommodations like hotels, restaurants, and theaters." *Id.* Plaintiff's only surviving claim for disability discrimination is against Defendant CCS under Title II, the Rehabilitation Act, or Title III.

Under Title II, "[s]tate prisons fall squarely within the statutory definition of 'public entity,' which includes 'any department, agency, special purpose district, or other instrumentality of a State or States or local government.'" *Pennsylvania Dep't of Corr. v. Yeskey*, 524 U.S. 206, 210 (1998) (quoting 42 U.S.C. § 12131(1)(B)). The weight of authority, however, holds that private organizations are not "public entities" under Title II, even when the private organizations perform traditional government functions pursuant to a contract with state or local governments. *Green v. City of New York*, 465 F.3d 65, 79 (2d Cir. 2006) ("A private hospital performing services pursuant to a contract with a municipality even if it does so according to the municipality's rules and under its direction, is not a creature of any governmental entity"); *Maringo v. Warden, Corr. Corp. of Am., (CCA)*, 283 F. App'x 205, 206 (5th Cir. 2008) ("Title II and Title III of the ADA are not applicable to" a private prison operator); *Edison v. Douberly*, 604 F.3d 1307, 1310 (11th Cir. 2010) ("Since GEO is such a private corporation, we hold that GEO is not a public entity subjecting it to liability under Title II of the ADA"); *Phillips v. Tiona*, 508 F. App'x 737, 748 (10th Cir. 2013) ("Relevant decisions by the overwhelming majority of courts

support the conclusion that the ADA does not apply to private prisons"); *Matthews v. Pennsylvania Dep't of Corr.*, 613 F. App'x 163, 169 (3d Cir. 2015) (same).[7]

"Section 504 of the Rehabilitation Act of 1973 prohibits discrimination against handicapped persons in any program or activity receiving federal financial assistance." *U.S. Dep't of Transp. v. Paralyzed Veterans of Am.*, 477 U.S. 597, 599 (1986). Plaintiff cannot pursue a claim against Defendant CCS under the Rehabilitation Act because he has not shown that Defendant CCS receives federal financial assistance. Plaintiff has not shown that Defendant CCS contracts with the federal government, and it is not sufficient that some federal money might ultimately flow through its contract with the state of Maine to Defendant CCS. *See id.* (holding that Rehabilitation Act only covers entities directly receiving federal funds, not entities indirectly benefiting from federal grants); *see also Lee v. Corr. Corp. of Am./Corr. Treatment Facility*, 61 F. Supp. 3d 139, 144 (D.D.C. 2014) ("Courts interpreting § 504 of the Rehabilitation Act have consistently construed 'Federal financial assistance' to mean the federal government's provision of a subsidy to an entity, not the federal government's compensation of an entity for services provided").

Under Title III, a plaintiff must show that "the defendant's establishment is subject to the mandates of Title III as a place of public accommodation." *Dudley v. Hannaford*

---

[7] This does not mean that disabled prisoners are without a remedy for disability discrimination by private actors in the correctional environment. Courts have noted that under Title II and its implementing regulations, states are liable for discrimination carried out by their private contractors. *See Henrietta D. v. Bloomberg*, 331 F.3d 261, 286 (2d Cir. 2003); *Castle v. Eurofresh, Inc.*, 731 F.3d 901, 910 (9th Cir. 2013) ("The State Defendants are free to enter into such contracts, and likely reap numerous benefits from such arrangements. But one benefit State Defendants may not harvest is immunity for ADA violations . . . . The law is clear—the State Defendants may not contract away their obligation to comply with federal discrimination laws"). Because Plaintiff did not join the Maine Department of Corrections or another state agency as a party to this action, however, the Court need not address this issue further.

*Bros. Co.*, 333 F.3d 299, 307 (1st Cir. 2003). "The phrase 'public accommodation' is defined in terms of 12 extensive categories" of examples. *PGA Tour, Inc. v. Martin*, 532 U.S. 661, 676 (2001). Prisons and prison medical facilities are not listed among the statutory examples. Courts have contrasted "public accommodations" that are "open to the general public" with private clubs utilizing a "limited guest policy." *See e.g.*, *Jankey v. Twentieth Century Fox Film Corp.*, 14 F. Supp. 2d 1174, 1178 (C.D. Cal. 1998).

The weight of authority suggests that prisons and prison medical facilities are not "public accommodations" within the meaning of the ADA. *See e.g.*, *Maringo v. Warden, Corr. Corp. of Am., (CCA)*, 283 F. App'x 205, 206 (5th Cir. 2008) (holding that Title III of the ADA was not applicable to a prison); *Maher v. Tennessee*, No. 16-1314-JDT-CGC, 2018 WL 1404405, at *4 (W.D. Tenn. Mar. 20, 2018) ("prisons such as the HCCF which are operated by private companies are not among those private entities that are considered a 'public accommodation'"); *Valdovinos-Blanco v. Vaughn*, No. CV 11-0436 MCA/WPL, 2012 WL 13076554, at *5 (D.N.M. Apr. 12, 2012) ("Each court to tackle this issue has found, without doubt, that a prison is not a place of public accommodation"); *Wattleton v. Doe*, No. CIV.A. 10-11969-JGD, 2010 WL 5283287, at *2 (D. Mass. Dec. 14, 2010) (federal prison not a place of public accommodation); *but see, Hernandez v. Cty. of Monterey*, 70 F. Supp. 3d 963, 978 (N.D. Cal. 2014) ("Plaintiffs have sufficiently alleged that CFMG 'operates' a professional office in the actual physical 'place' of the jail to provide the 'public accommodation' of all required medical care").[8]

---

[8] Under Maine's analogous anti-discrimination law, the Maine Human Rights Act, some Maine courts have interpreted the phrase "places of public accommodation" to exclude correctional facilities. *See Napier v.*

Even if Defendant CCS operated a place of public accommodation, Title III incorporates the remedies of the public accommodation provisions of the Civil Rights Act of 1964, which "allows only injunctive relief (as opposed to money damages)." *Dudley*, 333 F.3d at 304. A Title III claim, "therefore requires some ongoing harm (or, at least, a colorable threat of future harm)." *Id.* "The Constitution 'confines the jurisdiction of the federal courts to actual cases and controversies.'" *Ford v. Bender*, 768 F.3d 15, 29 (1st Cir. 2014) (quoting *Barr v. Galvin,* 626 F.3d 99, 104 (1st Cir. 2010)). "A case generally becomes moot when the controversy is no longer live or the parties lack a legally cognizable interest in the outcome." *Id.* (quoting *Shelby v. Superformance Int'l, Inc.,* 435 F.3d 42, 45 (1st Cir. 2006)). "A prisoner's challenge to prison conditions or policies is generally rendered moot by his transfer or release." *Id.* As this Court has already held in granting another defendant's motion to dismiss (Order Affirming Recommended Decision, ECF No. 55), any potential claim under Title III is moot now that Plaintiff has been released from custody.

Finally, even if Defendant CCS were a proper defendant under the ADA or the Rehabilitation Act, to qualify as disabled "[P]laintiff must establish that [he] suffers from an impairment . . . that the impairment affects a major life activity, and . . . the impairment substantially limits the major life activity." *McDonough v. Donahoe*, 673 F.3d 41, 46 – 47 (1st Cir. 2012). Plaintiff has not demonstrated that he is disabled within the meaning of

---

*State*, No. CIV.A. CV-00-042, 2002 WL 32068249, at *7 (Me. Super. Nov. 18, 2002) ("[Public Accommodations] are places where members of the public have free access to conduct business . . . . As the defendant points out, a prison is not fully open to the public and access to its functions are necessarily quite limited and controlled").

the ADA or the Rehabilitation Act.  To the contrary, the record evidence establishes that Plaintiff was able to hear and function with the correctional facility, except for his failure to wake up for count on a few occasions.  The medical records do not support a finding that Plaintiff suffers from a disabling hearing deficit.

In short, Defendants are entitled to summary judgment on Plaintiff's disability discrimination claim.

## CONCLUSION

Based on the foregoing analysis, I recommend the Court grant Defendants' Motion for Summary Judgment.  (ECF No. 70).

## NOTICE

A party may file objections to those specified portions of a magistrate judge's report or proposed findings or recommended decisions entered pursuant to 28 U.S.C. 636(b)(1)(B) for which de novo review by the district court is sought, together with a supporting memorandum, within fourteen (14) days of being served with a copy thereof.  A responsive memorandum shall be filed within fourteen (14) days after the filing of the objection.

Failure to file a timely objection shall constitute a waiver of the right to de novo review by the district court and to appeal the district court's order.

/s/ John C. Nivison
U.S. Magistrate Judge

Dated this 19th day of March, 2019.